We'll move to the second argument set for this morning, Kelly-Ross & Associates v. Express Good morning, Your Honors. Is the microphone working okay, audible? Yes, okay. My name is Gary Menke from the law firm of Talmadge Fitzpatrick. I represent appellant Kelly-Ross & Associates. So I'd like to reserve five minutes for rebuttal, by the way, if I may. Under Washington law, the touchstone principle that guides the court's analysis of all three contract-related claims that are before the court in this appeal is reasonableness. And that manifests itself a little bit different ways when looking at each claim. But reasonableness is kind of a touchstone, a north star. And so we start first with the claim of breach of the express contract terms. You know, Washington law teaches that summary judgment is appropriate only if there's a single reasonable interpretation of a contract's express terms. And in Berg, the Washington Supreme Court reiterated a longstanding principle that the courts will prefer an interpretation that is reasonable and prudent and will reject interpretations that are unreasonable and imprudent. And Washington courts have also reiterated when looking at a commercial contract, which this one indisputably is, that the interpretation must be commercially reasonable. So with each of the three layers of analysis here, first looking at the specific words in the contract, second, looking at the surrounding provisions around those express words, and then third, looking at all of the contextual extrinsic evidence that sheds light on the meaning of the specific words that are in dispute. Their reasonableness undergirds each one. So what are the express words that support my client's breach of contract claim? So we look at the reimbursement table, covered specialty medications. And the contract defines specialty, covered specialty medications by referring to the definition for covered medications. And that definition in turn tells us that we're talking about prescription drugs. And so that particular definition leads us to conclude when there is something listed in that table, we're talking about a prescription drug. We're not talking about the trademark itself. We're talking about the prescription drug that the trademark refers to and names it. And then, okay, so to cut to that, is effectively your argument that EDTF or generic Truvada is Truvada? I mean, isn't that the crux of it? Because if it isn't, it's simply not in the table. And I take it your argument would be that everything in that table, which uses a name that has a legal significance and I guess a pharmacological significance, also includes one or more generics of it. Is that correct?  And therefore, your argument would apply to everybody who's supplying any generic for any of these 40 or 50 drugs? Correct. And nobody's tried to do that before? You guys are just the best lawyers? Well, you know, Your Honor, the Express Scripps has said, you know, look, we haven't read this contract for anyone. We don't think that disposes of the issue. It doesn't dispose of it, but at least there's a lot of money involved and a lot of other people have good lawyers. And I'm willing to concede that you may be the best of all of them. But it's at least a little interesting that there's not a whole gang that are trying to make this case for every one of these drugs. Yeah, and I think there's a lot of reasons that that can happen. I mean, look at class action lawsuits where consumers band together to seek redress for a breach of a consumer contract where the individual damages might not be substantial enough to sort of go it alone. So I think the explanation more is my client is a plucky independent company that has been the first that is willing to stand up and say that this is an incorrect interpretation of the contract. You might have other... Is Truvada the only drug that they supply or generic Truvada the only drug of this sort that they supply? I don't know the full list of specialty medications and other non-specialty medications that are provided, but it is a full-service pharmacy. But I think it's fair to say that it's a flagship service that this pharmacy provides. My client operates a long-term care pharmacy at Harborview Hospital here on First Hill, which is a public hospital that serves vulnerable populations. A clinic here locally that serves a lot of populations that are particularly vulnerable to contracting HIV-AIDS. And so I think one explanation to Your Honor's question is why is your client the first is because this particular drug features so prominently in its business and the services that it provides. Let me take you on one other question then because I think part of your argument is if you look at that table that currently the generics A, which is single source, generics B, which is multi-source, they're not paying on any of those. But am I correct that under the contract they could add it as by negotiation or mercy, say okay EDTF is now a covered specialty medication and it would go into generics A or some other generic, which is the equivalent that comes from two sources, there would be a place for it to be billed. Is that correct? Yes, with one tweak. Okay. So yes, but it wasn't necessary here. But if the court holds that it was necessary and that the word Truvada encapsulates only the brand version and that there needed to be some description of the generic needed to be in there, then we're saying that Express Scripts had the ability to amend that table and acted in bad faith and unfairly when it did not and also violated. But just up there, they had the ability, but that suggests there's no obligation as written under the contract. While there isn't an absolute obligation, Your Honor, we think that the duty of good faith and fair dealing is overlaid on that. And Washington law teaches that's a contextual analysis. So based on the circumstances presented here, we would say that the duty of faith and fair dealing require the inclusion of the generic under this case's circumstances. And you've argued that they're essentially bioequivalence, but in looking at which box they fall under, you do put the generic in a different box than the brand name Truvada, correct? Under a different box? Well, I mean, as to where they go into, you put them in the generic box, the generic. You don't actually suggest that it belongs in the same box as the brand, correct? Under the same box, you mean like a literal retail package? No, I mean that you have these charts that you've presented under the same table. We'll call them tables. Charts, tables, whatever you want to call it. But also in a literal box, you can't put the generic in a box that says Truvada. Even though it's bioequivalent. Maybe it'd be useful for a second just to direct the court. So Express Scripps asked both the district court, when the district court did in this court, to take judicial notice of the public records in the U.S. trademark and patent offices files for the registration of the trademark Truvada. So last night, I actually spent more time looking through it, and there's a specimen that the maker of Truvada, the holder of the trademark, has to have. And so I just want to, the court can go look there, because the Express Scripps, and so this... What excerpt of record are you looking at? So I'm referring to... Are you looking at a public record? This is a public record, and I believe it's properly before the court, because the district court was asked to take judicial notice of these records and did so. And this court, likewise, has been asked to take judicial notice of them by Express Scripps. And so this is in the public record on the... But is it in the record before this court? It's not actually in the excerpts. It's in the public... It just seems like it would be helpful if you thought it should be in the excerpts, because they did take judicial notice that you had provided to us and opposing counsel before the argument, because you're holding up a piece of paper that we can barely read. Yeah. So I brought copies and informed opposing counsel, and he may object, I'm not sure. But I don't think it's strictly necessary to look at this document to support our claim, but I do think it provides some help. So I can provide it with a letter later, or leave copies with the clerk. But the brand label says... It might be appropriate in a 28-J letter. Will do, Your Honor. And perhaps with a motion to take judicial notice, if that's what you want us to do. Okay. We certainly can do that. So what I think you'll see, and we'll speak about more in such materials, is that when the word Truvada is used, it's referring to that underlying biochemical drug, right there on the label that the maker itself has presented to the United States government. And then we have other evidence of trade uses that confirms that that's how drug is spoken about. Dr. Peterson, a high-ranking employee of Express Scripts, in his deposition said, well, it's not even quite accurate just to refer to those chemical components alone to refer to this drug, because there are other drugs that also use those same chemicals. So for example... Isn't this the same thing with any standard drug versus... I mean, generic drugs, there's a whole market for generic drugs. Yeah. When you go get... A lot of times the physician, or when you get your prescription filled, they'll say, do you want the original, or do you want the specialty, or do you want the generic, because the generic might cost less? So I mean, how does that play? Does that have any bearing on this? Or not really, because we're just looking at a specific contract? I think the answer is both, Your Honor. And to use an example, let's say we had these same tables, and that they were aligned in this way that they're presented, where right beneath a rate for brand and generics is a list of tables. Let's say it was Tylenol, Advil. Well, if you came and say, well, we filled a prescription for acetaminophen, we expect to be reimbursed for the generic rate for Tylenol, because that's the generic of Tylenol. Likewise for Advil. If we got a prescription for Advil, and we filled it with ibuprofen, we would expect to be reimbursed at the rate that's right above that table, and not sort of caught by surprise. Well, actually, acetaminophen is something entirely different from Tylenol. It's not the brand Tylenol, and we're going to refer to this completely different reimbursement chart that doesn't appear right above the list. So I think, Your Honor, the answer to your question is it's both. You can use your common sense, because that dictates, well, what's reasonable. How would the, what's the objective manifestation of the party's agreement? Is the Truvada formula, was it a patented formula, or has the patent expired? It was patented, and it was expired. It was heavily litigated. It was supported by research from the U.S. government. The first Trump administration sued the manufacturer, in fact, for violating a patent that it believed was held by the United States government. I have just two minutes left. If I may, I'd like to reserve the remainder for my rebuttal. Good morning. May it please the Court. Danny Solomon for Express Scripts. This is a breach of contract case between two sophisticated parties. Kelly Ross is unhappy with its reimbursement rate for one drug over a seventh-month period under a contract that it agreed to. That's it. This case is not about the duty of good faith in protecting consumers. It's a contract dispute. Because Express Scripts reimbursed Kelly Ross according to the contract's terms, this Court should affirm. I'd like to start with the contract. As Judge Boggs honed in on, it depends on the meaning of the word Truvada. And the word Truvada is a name which designates the drugs sold and manufactured by Gilead Sciences. And when this contract came out in 2018, there were no generics on the market. And so, by including Truvada in the table, it, by law, referred only to the brand version of that medication. And so, when the contract doesn't say that the contract, by listing a brand medication in the table, it includes all generics that will subsequently come to the market. And therefore, even when a generic enters the market, the contract doesn't require Express Scripts to for the generic versions that come out. You could add it to the table. Is that correct? That's right. For any of the, I mean, I presume some of these have generics, some of them don't. Some of them have multi-source. Some of them have single source. That's right. The contract gives Express Scripts full discretion to add medications to the table at any time without notice to Kelly Ross, without formal amendment. So, if tomorrow it decided to add a generic drug, it could do so. And if it did that, then that generic drug would be reimbursed. Under the generics, a rate that is there. Presumably, you know, if they have some kind of in with you or market power or something, they could go negotiate that with you, as could everyone else. So, the drugs that are in the covered special medications table, those are not necessarily negotiated. The rates are negotiated. But because the covered special medications table applies to all similarly situated providers, those aren't necessarily, could be negotiated. You mean the list isn't negotiated? The list is not negotiated because it's a contract that when changes are made to the table, it will apply, as the contract says, to all similarly situated providers, which is essentially Express Scripts, the unaffiliated specialty credentialed pharmacies and Express Scripts network. Has your client ever, in this contract time period, added generics to any of these? No, a generic. Multi-listed drugs. No, a generic has not been added to the table. It has been changed and drugs have been replaced and other drugs have been added. But a generic drug has not been added, but it could. It has discretion to do that. When this contract was written, you would think that somebody at least thought about the possibility. Otherwise, there would be no reason to have generics A and generics B listed there. Sure, sure. And that's because it could, for example, if a brand medication, for whatever reason, was stopped, was stopped being manufactured, and Express Scripts thought that the generic version should be covered under the special medications table, then it could exercise its discretion to add the generic version. Let me ask you this. We say it's biochemically equivalent. Is it physically marked in a way that is, if I took a Truvada pill and an EDTF pill that was not Truvada, could I tell the difference by any means whatsoever? I don't know the answer to that, Your Honor. A lot of pills are, you say, it has a 234 on the bottom, or it has an L in the corner. Sure. I don't know the answer to that. I will say that Teva cannot put on their bottles Truvada, because it's not. It's going to say emtricitabine tenofovir disoproxyl fumarate tablets. And that's how Teva refers to the drug on their website. They say that their drug... But I don't know why that's determinative, because that's true of a lot of generics. You can't say that it is the original, but the blue pill or whatever the generic is. Well, the contract doesn't say generic Truvada, and it doesn't say ETDF either. And so if the word Truvada only has one meeting by law, because it refers to the drug that Gilead Sciences sold and manufactured, then it doesn't include... What is the generic table for then? Above that? Yeah. If Express Scripts were to exercise its discretion to add a generic rate to the... But it never has. It never has. But if it wasn't there, then what would... Because Express Scripts cannot unilaterally add rate tables to the contract, those would need to be formally negotiated, and the contract would need to be formally amended. If that rate table wasn't there and Express Scripts wanted to exercise its discretion, it wouldn't be able to exercise its discretion and to add the drug without notice and formal amendment, because it would need to go to every single pharmacy and formally negotiate what the generic A rate would be. So by including that from the beginning, it essentially gives Express Scripts the ability and the flexibility to exercise a discretion under the contract or without... Otherwise, they would have to formally amend it. Pharmacies who operate under your contract, they basically are disincentivized from prescribing generics. No, Your Honor. So the... And this is the point I want to make about reasonableness. So prescription drug pricing is complex and dynamic. There are thousands and thousands of approved drugs, brands and generics, and made by different manufacturers and sold by different wholesalers. And Kelly Ross's contract provides five different reimbursement rates, and they get the lowest of five different ones. Now, one of these reimbursement rates, the one we're dealing with, is average wholesale price. And this is an independent third-party metric, which is used in the pharmaceutical industry for reimbursement. And the contract doesn't set an AWP discount rate for every single one of the thousands and thousands of drugs. It sets one AWP discount rate for brands and one AWP discount rate for generics. And what this means is that Kelly Ross's profit margin on a particular drug is going to depend on their acquisition costs, which Express Scripts does not control. So like any business, sometimes Kelly Ross's profit margin is high on a particular drug, and other times it might be low. This is normal in business. And Kelly Ross knows this. They're a sophisticated pharmacy group. They have four locations. They have a full C-suite of executives. You're saying there's other market forces that would encourage them to use generics because the profit margin might be greater, even though there's no reimbursement. Right. And the bottom line is, we're only talking about the first seven months when generic Truvada came out. And Kelly Ross knew their acquisition costs. They knew their reimbursement rate, and they kept on buying it anyway. I mean, they submitted a notice of dispute to Express Scripts in the middle of October, because claims adjudication basically happens immediately. And they were aware of exactly what their reimbursement rate was, and they kept on buying eTDF anyway throughout the entire seven-month period, even after we told them in December that this is what the contract says, this is the rate you're getting. They produced an invoice from AmerisourceBergen a week later, where they kept on buying eTDF. And the reason why they kept on buying eTDF is because dispensing medication as part of this one-step prep clinic was just a small part of their business. I mean, they essentially pioneered this HIV prevention program, where they're not only dispensing medication, but their pharmacists are operating as providers in this clinic, where they're essentially functioning as doctors. And they're prescribing medication, they're meeting with patients, they're monitoring lab tests, ordering lab tests, and they're billing health insurance companies for this. So this was a, and their owner testified, this is a highly profitable clinic. And so they continued to buy eTDF, even though they knew exactly what their reimbursement rate was. And so there's a much broader context here than, oh, yes, they were losing money on every single prescription. If it's true what they say, yes, they were losing money, but you have to look at it in the broader market. Let me ask about the state law claim on good faith and fair dealing, because you have emphasized before that the ability to add generics or to even add drugs to this specialty list is solely within the power of your client. Is that right? Yeah. So it's basically a lopsided deal, you take it or leave it? Not necessarily. I mean, so the starting point for their breach of good faith claim in their complaint is that to the extent it's determined that eTDF is not a covered specialty medication sale, which means the starting point for the breach of good faith claim is that Express Scripps paid them exactly what they were entitled to under the agreement. And nevertheless, when Kelly-Ross came to Express Scripps and said, hey, we're losing money, you should pay us more, you should add eTDF to the covered specialty medications table, that they were required to use their discretion under the contract to pay Kelly-Ross more than what the contract requires. And as a matter of law, that doesn't state a good faith claim under Washington law, because a party cannot breach its duty of good faith by simply standing on its right to require performance of the contract according to its terms. The contract says what it says. Express term requiring Express Scripps to use its discretion, and therefore Express Scripps wasn't required to essentially pay Kelly-Ross more than what the contract requires. I mean, if this court were to endorse their theory of good faith in any time pharmacy was losing money under a contract, they could come to Express Scripps and say, hey, you have to pay us more because you have the discretion under the contract to do so. And just so I can be clear, because there are these complicated tables, they do get paid for eDTF. It's just it's paid under the original table, generics A. Is that correct? That's correct, your honor. In ES 1000, their reimbursement rate is for when it's when it's the AWP discount is section 2.4 A. And that section also has a table for brand rates and effectively, they they want to move out of that table and move into this table by a definition only for seven months, because the problem resolved on its own when additional when additional generics enter the market in May 2021. We were not talking about some perpetual generics. Then how did that resolve it? Because their acquisition price changed the price, essentially the pricing under the contract, the market, the market, the law didn't change. Right. And Express Scripts got it. Express Scripts didn't change anything under the contract. The problem for 2.4 A. Truvada is not listed under a brand there, but there's just a generic box and that's where they would fall. That's that's right. So essentially for the section 1.3 and attachment one says for any drug that's not a covered special medication, the applicable rate table will apply in that section 2.4 A. So essentially for again, when the AWP discount rate provides the lowest rate under the contract for any drug that's not a covered special medication, the 2.4 A rates would apply. Okay. And so the thing about others entering the market, did that move it from generics A to generics B because it became a multisource? Yes. And and also the pricing itself. The market changed, but it did change the additional, the additional manufacturers did move it to generics B. Right. And when it becomes a generics B, it's actually not even reimbursed under the AWP discount rate. It's, it's, it has a different rate listed. There's a MAC list, which is another, another price, the maximum allowable cost, which is another metric used in pharmacy for pharmacy reimbursement. So just to work back to the breach of good faith claim, I mean, the, under, under Washington law, a party is not required to accept material changes to the contract. And essentially, Kelly Ross wants Express Scripts to, to, to say, okay, we'll, we'll pay you more than the, the, than the contract requires, even though you, you agree that the contract says what it says. And, and they say no case under Washington law, which, which, which shows that a party needs to accept changing the contract just because it's given a discretionary term. And it would eviscerate the discretion that Express Scripts has under the contract. If they're required to essentially make their contractual parties whole, every time a party complains that the contract's not working out as well in their favor. I mean, Kelly Ross, isn't returning profits to Express Scripts when Express Scripts reimbursement rates work out really well in their favor. They're not saying, hey, we did really well on this drug. So we're going to give you back a little bit. They're gladly taking the profit margins when it works out well in their favor. And, and unfortunately, sometimes it doesn't, even if it's just for a seven month period. If there's no further questions on the breach of good faith claim, I would like to just make one point on the Consumer Protection Act claim. The, this court has held since Lacey, and we cited several cases in our, in our brief, that when a claim is, is voluntarily, voluntarily dismissed, which means it's, it's not repleted after it's dismissed without prejudice and leave to amend, it's waived. And this is, this is panel precedent. We cited several cases in our brief, and there's many others out there where, where panels have refused to consider claims. This is, this is the law and, and this, and this court should not adopt Kelly Ross's proposed reformulation of the, of the rule. I mean, essentially they want courts to evaluate the plaintiff's subjective belief as to whether they could state additional facts under the You essentially tell courts that they have to think what the plaintiff and what, whether the plaintiff thinks that they could. But would they, would they get a right to amend so they could go back and replete it or? I'm not sure procedurally how it, procedurally how that would work. I mean, they definitely had the opportunity to amend this for, this case has been going on for, it'll be three years in January. I mean, they, they cite a bunch of additional facts in their brief, which they think helped them state a claim. At no point below did they, did they say, you know what, wow, these facts actually help us state a claim, let's replete it. This claim was dismissed without prejudice and to be fundamentally unfair. Never saw it leave. Never saw it leave. I mean, it'd be fundamentally unfair to now send this back to square one when they, it was case sat for three years and they, and they had the opportunity to replete that. And so, I mean, the, the, under prior panel precedent, this court is, is, is obligated to, to find it was voluntarily dismissed and we would ask the court to do so. Okay. Thank you. Thank you. We've got a couple minutes for rebuttal. Your Honor, the reason that my client continued to fill prescriptions with generics was that it was legally required to do so. Washington law specifies that if a doctor writes a prescription that, that says the brand, so it says Truvada and checks a box, generics permitted, the pharmacy must fill the prescription with the generic unless the plaintiff, or excuse me, the patient expressly requests not to get the generic. So they, they were legally required to, and that's why they did so. Wait, I thought you were the, at least what I heard was you were the physician, your client was the physician and the pharmacy here basically. Is that not true? The doctors can write the prescriptions, but the client provides some other wraparound services that are necessary to ensure these vulnerable populations continue to have access to these kinds of medications and are undergoing a holistic program to prevent HIV infections and passing those along, for example, periodic lab testing. So there are some wraparound services, but for every... They were writing, was your client also writing the prescriptions? I don't know. Okay. I don't know. One other point I want to make, in many cases... Let me just add, the way you phrased that suggested that any pharmacy they went to would be required to provide a generic. That's correct. So if they went to CVS, but CVS doesn't have the generic, it's not... What's the answer there? So in your scenario, CVS just doesn't stock it? Correct. They can't... My understanding of Washington law is it can't fill that prescription unless they have the generic. They're required to provide the generic because the legislature wanted there to be access to lower cost generic drugs. I'm just trying to understand that every single pharmacy in Washington state must supply this generic if asked. Is that your position under Washington law? If they're going to fill that prescription, then yes. Well, no. They would say, I'm sorry, I can't fill this prescription. They can just turn them away. They say, we don't have this. Do you see? I don't have it. But your client decided to have it. Right, right. So I mean, that's why I was a little bit feeling like there was something not the complete story when you made your statement because they go to Rite Aid, they go to CVS, they say, look, we don't supply this, we don't stock it, we can't fill it. Why don't you try? Right. Well, I think that brings us back to the reasonableness inquiry, because one of the things that we're supposed to look at is the objectives of the contract. And cases teach us that we need to adopt a commercially reasonable interpretation that allows both parties to fulfill their functions. So my client is a specialty pharmacy. Their entire purpose, or central purpose, I should say, is to serve these vulnerable populations and to avoid the spreading of HIV-AIDS infections, which have absolutely decimated people. So have they made money along the way? Yes. But turning those people away is completely contrary to the central purpose of this pharmacy. And the specialty amendment that the parties agreed to, central purpose was to make sure that there was a specialty pharmacy that followed high levels of standards of care. That can't happen if express scripts can just go around and say, well, too bad, so sorry that you're losing money when you're actually filling these prescriptions for specialty medications. So if there's no pharmacy in Washington, if your pharmacy individuals, if Kelly Ross decided not to have generics, then Kelly Ross could provide the brand name, correct? If it's not available, if the generic is unavailable, then you have to buy the brand name, right? I don't know what happens at the market. I mean, I think that's the way the law works, that if the generic is unavailable, then you supply the brand name. Was your pharmacy in a position to supply the brand name? It was, but here the generic was available, it was manufactured, and there were wholesaler sources to provide it. So in those circumstances, yeah, it had to. Does that statement work the other way around? If the pharmacy only has the generic, it's fine. So if the patient wants the brand name, he just says sorry. Go to CVS. I don't know how that works in practice under the law when those are the circumstances presented. I see my time is over. Your Honors, we ask that the Court reverse the District Court's summary judgment orders and its orders dismissing on the pleadings my client's other claims. Thank you so much. Thank you to both counsel for your arguments in the case. The case is now submitted.
judges: Boggs, McKEOWN, NELSON